**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 19, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

JERREL MONTEL KING,

      Defendant-Appellant.

No. 09-5179

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. No. 4:09-CR-00107-CVE-1)**

---

C. Robert Burton of The Burton Law Firm, P.C., Tulsa, Oklahoma, for Defendant-Appellant.

Leena Alam, Assistant United States Attorney (Thomas Scott Woodward, United States Attorney, with her on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

---

Before **LUCERO**, **BALDOCK**, and **HOLMES**, Circuit Judges.[*]

---

**HOLMES**, Circuit Judge.

---

    [*]    After examining the briefs and the appellate record, this three-judge panel determined unanimously that oral argument would not materially assist in the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

A jury found Jerrel Montel King guilty of one count of possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D), and one count of possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). He now appeals his conviction only as to the firearms count, arguing that the government presented insufficient evidence to show either that he "possessed" the firearm or that he did so "in furtherance" of a drug-trafficking crime. Exercising jurisdiction under 28 U.S.C. § 1291, we conclude that sufficient evidence was presented to support the jury's verdict. Accordingly, we affirm Mr. King's conviction.

## I. BACKGROUND

Shortly after 11:00 p.m. on May 27, 2009, police were dispatched to the South Glen Apartments in Tulsa, Oklahoma, to address a reported disturbance involving a man with a gun. Upon her arrival at the scene, Officer Aubrie Thompson saw a number of people milling about outside two of the buildings in the apartment complex. After questioning a group of individuals gathered outside an open apartment, Officer Thompson turned her attention to two men, Mr. King and Shawnte Bryant, whom she spotted loitering between the two buildings.

As Officer Thompson questioned the two men about the disturbance, she noticed that Mr. King was "very agitated" and was being very uncooperative. R., Vol. II, at 22 (Trial Tr., dated Sept. 23, 2009). She also observed that Mr. Bryant was making circles during the course of their conversation and was

- 2 -

"frantically looking [for something] on the ground." *Id.* at 24–25. Finding this behavior odd, Officer Thompson shined her light on the area where Mr. Bryant was searching and observed a pistol lying on the ground about four inches away from Mr. King's foot. During this time, the two men were joined by Leginia Washington, a female companion of Mr. King, who previously had been sitting in a nearby parked car. Officer Thompson drew her weapon and told the two men and Ms. Washington to back away from the pistol. She then radioed dispatch, asking for additional units to be sent to the scene. Backup arrived shortly thereafter, and the police secured the gun—a chamber-loaded Hi-Point nine-millimeter semi-automatic pistol.

The police then took Mr. King, Mr. Bryant, and Ms. Washington into investigative detention, and Mr. King was patted down for weapons. The frisking policeman, Officer Robert Johnson, discovered more than $500 in cash and a set of digital scales with marijuana residue in Mr. King's pockets. Mr. King also had a cell phone on his person which, upon inspection, revealed several text messages that appeared to be drug-related and a photograph showing a Hi-Point rifle with an extended magazine.

Also present at the scene was Officer Todd Taylor. While assisting in the investigation, Officer Taylor received information from another officer that a car

parked in the complex parking lot might contain contraband.[1] Ms. Washington was identified as the owner of the vehicle, and Officer Taylor obtained her permission to search it. In the vehicle, he discovered a chamber-loaded Stoeger .40 caliber semi-automatic pistol on the passenger-side front floorboard, as well as a "blunt"[2] in the front passenger seat. A search of the trunk further revealed two large "bricks" of marijuana—one weighing 1119.53 grams and the other 1522.19 grams—and a loaded Hi-Point nine-millimeter rifle with an extended magazine.

Following this discovery, Officer Taylor took Mr. King into custody and advised him of his *Miranda* rights.[3] Mr. King indicated at that time that all of the contraband found in the car was his, telling Officer Taylor, "it's all mine[;] I'll take it as long as my baby's mama don't go to jail." R., Vol. II, at 59. Later, he repeated this admission during the intake process at the police station. Mr. King ultimately disclaimed ownership of the Stoeger pistol, however, after Officer Taylor warned him that he "d[id]n't want [him] to claim anything that is not

---

[1] Neither the name of this officer nor the source of this information is included in the record.

[2] Officer Taylor testified that a "blunt" is a "marijuana cigar." R., Vol. II, at 51. He further stated: "[P]eople, they'll cut the outside off of a cigar and then they'll use that as a rolling paper . . . for their marijuana. They'll put marijuana in it and then seal it back up." *Id.*

[3] *See generally Miranda v. Arizona*, 384 U.S. 436, 467–474 (1966) (noting the rights).

[his]." *Id.* at 61. Yet, when the officer held up the Hi-Point pistol, Mr. King stated, "yeah, that one is mine." *Id.* He also claimed ownership of both the rifle and the marijuana again, reiterating that "it's all mine, as long as . . . my baby's mama don't go to jail." *Id.* Nevertheless, when Officer Johnson asked Mr. King to write a statement detailing these facts, Mr. King refused to do so.

Mr. King was subsequently charged in a two-count indictment with possessing marijuana with the intent to distribute and possession of all three firearms in furtherance of a drug-trafficking crime. At trial, the government based its case primarily on the testimony of Officers Thompson, Taylor, and Johnson, who all detailed their roles in Mr. King's arrest. It also introduced the photograph found on Mr. King's phone of a rifle with an extended magazine, which Officer Taylor testified "appear[ed] to be" the weapon seized from the trunk of Ms. Washington's car. *Id.* at 62. Officer Taylor also read several text messages to the jury from Mr. King's cell phone that the officer believed related to drug trafficking.[4] Officer Taylor admitted, however, that he did not observe Mr. King dealing drugs or physically possessing a weapon.

In addition, the government presented expert testimony from Officer Ronnie Leatherman, a ten-year veteran of the Tulsa Police Department. Officer

---

[4] Included amongst the relevant text messages were exchanges discussing the pricing for drugs (e.g., "Do you got two bricks for six twenty five apiece [sic]"), requests for drugs (e.g., "Call when you get the dime"), and admissions of past sales (e.g., "I just sold a blunt"). R., Vol. II, at 64–66.

Leatherman testified that the "bricks" of marijuana found in the trunk of Ms. Washington's car, which he valued at between $1200 and $1500 each, were consistent with distribution, and inconsistent with personal use, based on their size and packing. He also stated that scales like the one found on Mr. King's person are often used to weigh narcotics for sale, and he confirmed Officer Taylor's understanding that the text messages recovered from Mr. King's phone contained references to narcotics transactions. He further testified to the various roles firearms play in the drug-trafficking business. Officer Leatherman observed that, while the smaller guns would likely be carried by the dealer for personal protection, the Hi-Point rifle, due to its size, normally would be kept in either a car or house "for some type of protection, intimidation type purpose." *Id.* at 94. As the rifle was locked in the trunk with the drugs, Officer Leatherman opined that "[t]he gun would be protection for the marijuana." *Id.* at 98.

Finally, the government offered testimony from the manager of the Tulsa Police Department's forensic laboratory. The manager was responsible for processing the three firearms recovered during Mr. King's arrest and checking the weapons for latent fingerprints. He admitted that the one latent fingerprint found on the weapons did not match the fingerprint sample that Mr. King provided, but stated that this did not foreclose the possibility that Mr. King had handled the firearms. More specifically, he described how the "human factor"—i.e., the

variable conditions of people's fingers and palms—can often make finding latent fingerprints a difficult endeavor. *Id.* at 104.

At the close of the government's case, Mr. King moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, citing insufficient evidence for a jury to infer either that the marijuana in the car was his or that he possessed the firearms in question. After the government withdrew its claim as to the Stoeger pistol, the district court denied Mr. King's motion, finding that there was "more than sufficient evidence from which a reasonable jury could infer that the Defendant possessed marijuana with the intent to distribute and possessed the two remaining firearms in connection with a drug trafficking crime." *Id.* at 116. The defense then rested without presenting any additional evidence.

The jury eventually convicted Mr. King on the drug-trafficking count and on the firearm count, but only with respect to the Hi-Point rifle found alongside the marijuana in the trunk of Ms. Washington's car. Thereafter, Mr. King was sentenced to seventy-five months' imprisonment—fifteen months for possession with intent to distribute and the mandatory sixty months for possession of a firearm in furtherance of a drug-trafficking crime, to be served consecutively. This timely appeal followed.

## II. DISCUSSION

Section 924(c)(1)(A) imposes a mandatory minimum five-year sentence upon "any person who, . . . in furtherance of any [drug-trafficking] crime,

possesses a firearm." 18 U.S.C. § 924(c)(1)(A)(i). On appeal, Mr. King challenges the sufficiency of the evidence supporting his conviction under this statutory provision, contending that the evidence adduced at trial failed to show both essential elements of the charged offense—namely, that (1) he "possessed" the Hi-Point rifle found in Ms. Washington's trunk, and (2) he did so "in furtherance" of a drug-trafficking crime. Mr. King does not, however, challenge his conviction for possession of marijuana with intent to distribute.

"We review [a] challenge to the sufficiency of the evidence *de novo*, but in doing so we owe considerable deference to the jury's verdict." *United States v. Mullins*, 613 F.3d 1273, 1280 (10th Cir.), *cert. denied*, 131 S. Ct. 582 (2010). This court asks only "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Jameson*, 478 F.3d 1204, 1208 (10th Cir. 2007) (quoting *United States v. Hanzlicek*, 187 F.3d 1228, 1239 (10th Cir. 1999)) (internal quotation marks omitted). We will not "weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002). Rather, "[w]e may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010) (quoting *United*

*States v. Brown*, 400 F.3d 1242, 1247 (10th Cir. 2005)) (internal quotation marks omitted).

### A. "Possession" of the Hi-Point Rifle

Mr. King first challenges his conviction by claiming that the government failed to produce sufficient evidence to allow a reasonable jury to conclude that he "possessed" the weapon of conviction. "Possession of a firearm can be either actual or constructive." *United States v. Poe*, 556 F.3d 1113, 1125 (10th Cir.), *cert. denied*, 130 S. Ct. 395 (2009); *see also United States v. Avery*, 295 F.3d 1158, 1177 (10th Cir. 2002) ("Generally speaking, possession of contraband, whether it be drugs or a firearm, may be either 'actual or constructive.'" (quoting *United States v. Hager*, 969 F.2d 883, 888 (10th Cir. 1992), *abrogated on other grounds by Bailey v. United States*, 516 U.S. 137 (1995))). Mr. King asserts—and the government rightfully concedes—that he did not have "actual possession" of the Hi-Point rifle. *See Jameson*, 478 F.3d at 1209 (noting that "actual possession" of a firearm requires a showing that the party had "direct physical control over [it]"). The government maintains, however, that it "presented ample evidence showing that [Mr.] King constructively possessed the rifle found in the trunk of [Ms. Washington's] car." Aplee. Br. at 13. We agree.

Constructive possession of a firearm exists when an individual "knowingly hold[s] the power and ability to exercise dominion and control over it." *United States v. Lopez*, 372 F.3d 1207, 1211 (10th Cir. 2004) (alteration in original)

(quoting *United States v. Culpepper*, 834 F.2d 879, 881 (10th Cir. 1987)) (internal quotation marks omitted). Constructive possession is often found where an individual has "ownership, dominion, or control" over the premises wherein the firearm was found. *United States v. Ledford*, 443 F.3d 702, 713 (10th Cir. 2005). This inference of knowing dominion over or control of a firearm is appropriate where the defendant has exclusive possession over the premises. *See United States v. Hishaw*, 235 F.3d 565, 571 (10th Cir. 2000) ("In most cases, the defendant's dominion, control, and knowledge may be inferred if he has exclusive possession of the premises on which the object was found."). In contrast, in situations of joint occupancy, "where the government seeks to prove constructive possession by circumstantial evidence, it must present evidence to show *some connection or nexus* between the defendant and the firearm." *Ledford*, 443 F.3d at 713 (emphasis added) (quoting *United States v. Mills*, 29 F.3d 545, 549 (10th Cir. 1994)) (internal quotation marks omitted). "This requires the government to point to evidence plausibly supporting the inference that the defendant had knowledge of and access to the firearm." *Poe*, 556 F.3d at 1125 (citing *Ledford*, 443 F.3d at 714).

Mr. King argues that the government failed to present "any evidence establishing that [he] constructively possessed the [charged weapon] other than a picture of a rifle found on his cell phone," which he claims is insufficient to demonstrate either dominion or control over the firearm. Aplt. Opening Br. at 10.

- 10 -

More specifically, he claims that the government failed to present evidence suggesting access to the vehicle, noting that keys to the car were not found on Mr. King's person, nor were any of his personal effects found in the car.  He contends that this is a case where we need not even reach the nexus inquiry as "there [i]s no evidence . . . that [he] was ever 'present' or 'occupied' the car where the rifle was found in the trunk," and thus there was no showing of joint occupancy, which he reads as a requirement on these facts for constructive possession.  Aplt. Reply Br. at 3; *see also* Aplt. Opening Br. at 9.  Mr. King is mistaken.

Although we recognize that control over the premises where the firearm is found can be a strong indicator of constructive possession, *see, e.g.*, *Hishaw*, 235 F.3d at 571, we have categorically rejected Mr. King's assertion that it is a prerequisite to our determination of constructive possession.  *See Lopez*, 372 F.3d at 1213 ("Control or dominion over the premises where the item is found is . . . a factor, *but not a requirement*, for finding constructive possession of the item itself." (emphasis added) (internal citation omitted)).[5]  Instead, we have held that

_____

[5]     We acknowledge that the law in this circuit has been unclear on this point.  Prior to *Lopez*, a line of cases had emerged in this circuit that indicated that, "[g]enerally, a person has constructive possession of [contraband] if he knowingly has ownership, dominion or control over [it] *and* the premises where [it was] found."  *Hager*, 969 F.2d at 888.  This conjunctive requirement was restated—although never applied—in a number of our other cases.  *See, e.g.*, *United States v. Colonna*, 360 F.3d 1169, 1178–79 (10th Cir. 2004); *United States v. Scull*, 321 F.3d 1270, 1284 (10th Cir. 2003); *Hishaw*, 235 F.3d at 571; *United States v. Jenkins*, 175 F.3d 1208, 1216 (10th Cir. 1999); *United States v. Wilson*, 107 F.3d 774, 778 (10th Cir. 1997).

(continued...)

"constructive possession exists where the defendant *has the power* to exercise control or dominion over *the item*." *Id.* at 1212 (emphasis added). Put another way, what matters is whether the defendant has an "appreciable ability" (i.e., the power) to exercise dominion or control over the contraband. *United States v. Al-Rekabi*, 454 F.3d 1113, 1118 (10th Cir. 2006) (quoting *United States v. Verners*, 53 F.3d 291, 294 (10th Cir. 1995)) (internal quotation marks omitted).

We also have recognized that a defendant may exercise this ability or power personally *or* through others who have an adequate tie to the defendant. *See id.* at 1120 ("The bedrock of constructive possession—whether individual or joint, *whether direct or through another person*—is the *ability* to control the object.") (first emphasis added); *United States v. Lindsey*, 389 F.3d 1334, 1339

[5](...continued)
In *Lopez*, however, we declined the appellant's invitation to find error in the district court's jury instruction on constructive possession, which failed to require control over the premises in which the firearm in question was found. 372 F.3d at 1211–13. We did so on the basis that these cases were in tension with our earlier decision in *Culpepper*, where we reaffirmed our circuit's long-standing adherence to the principle that constructive possession of the contraband requires only that the alleged possessor "knowingly hold[s] the power and ability to exercise dominion and control *over it*." 834 F.2d at 881 (emphasis added) (citing *United States v. Massey*, 687 F.2d 1348, 1354 (10th Cir. 1982); *United States v. Zink*, 612 F.2d 511, 516 (10th Cir. 1980); *Amaya v. United States*, 373 F.2d 197, 199 (10th Cir. 1967)). As *Culpepper* pre-dated *Hager* and its progeny, we concluded that it "is the law in this circuit." *Lopez*, 372 F.3d at 1212; *see United States v. VanMeter*, 278 F.3d 1156, 1162 (10th Cir. 2002) (noting that "we follow an earlier, settled precedent over a subsequent derivation"); *United States v. Cruz Camacho*, 137 F.3d 1220, 1224 n.2 (10th Cir. 1998) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom." (quoting *Haynes v. Williams*, 88 F.3d 989, 901 n.4 (10th Cir. 1996)) (internal quotation marks omitted)).

(10th Cir. 2004) ("The evidence . . . showed Defendant maintained constructive possession of the firearms while Watson transported them [separately] in the U-Haul because he exercised dominion and control over Watson and the U-Haul. Defendant, although not in actual possession of the firearms at the time of his arrest, had both the power and the intention at the relevant time to exercise dominion and control over the firearms, either directly or *through Watson*." (emphasis added)); *United States v. Carter*, 130 F.3d 1432, 1441 (10th Cir. 1997) (holding that the defendant had constructive possession of drugs that were being transported by a third party based on a delivery agreement he made with the driver that made it "reasonable to infer [that the defendant] had the ability to guide the destination of the cocaine"); *cf. Massey*, 687 F.2d at 1354 (stating that a defendant may have constructive possession over narcotics when he or she has "some appreciable ability to guide the destiny of the drug" (quoting *United States v. Staten*, 581 F.2d 878, 883 (D.C. Cir. 1978))).

Guided by these principles,[6] we conclude that the evidence presented at

---

[6]     These principles concerning constructive possession are embodied in our pattern criminal jury instructions.  In pertinent part they provide:

> A person who, although not in actual possession, knowingly has the *power* at a given time to exercise dominion or control over *an object*, either directly *or through another person or persons*, is then in constructive possession of it.

Tenth Circuit Criminal Pattern Jury Instruction No. 1.31, at 50 (2006) (emphasis

(continued...)

trial was sufficient in this case to allow a reasonable jury to infer that Mr. King

had the *ability* (i.e., the power) to exercise dominion or control over the Hi-Point

rifle.  By Mr. King's own admission, he had been in an intimate relationship with

Ms. Washington (i.e., his "baby's mama"), and there was no evidence to suggest

that this relationship was not ongoing at the time of the offense.  Although Mr.

King did not have a key to the vehicle on his person, Ms. Washington most

certainly did, and a reasonable jury could infer from their relationship that Mr.

King could have accessed the rifle in the trunk at any time simply by asking Ms.

Washington for the key.  *See United States v. Payne*, 377 F.3d 811, 815 (8th Cir.

2004), *vacated on other grounds by* 543 U.S. 1112 (2005) ("At a minimum, the

close personal relationship between Payne and Eason and their joint undertakings

provided sufficient evidence of constructive joint possession of the guns in the

console."); *United States v. Ramos-Rascon*, 8 F.3d 704, 712 (9th Cir. 1993)

("[C]onstructive possession may be demonstrated circumstantially by the

defendant's special relationship to those who directly control the [goods].");

*United States v. Ocampo*, 937 F.2d 485, 489 (9th Cir. 1991) (observing that

constructive possession of narcotics may be proven by showing "exclusive

---

[6](...continued)
added).  We pause to endorse this instruction here.  Furthermore, significantly, this law also provided in material respects the framework for the jury's verdict in this case: the district court used almost verbatim the language of our pattern jury instruction with respect to constructive possession in its own instructions.  *See* R., Vol. I, at 49–50.

dominion *or . . .* some special relationship to . . . persons who directly control it" (emphasis added)). To be sure, the jury was not obliged to draw that conclusion from Mr. King's intimate relationship with Ms. Washington. We only hold that it reasonably could do so. Furthermore, we do not intend to suggest that access to contraband *through another* will *necessarily* equate with the ability to exercise dominion or control over the contraband. However, on these facts, we are confident that a reasonable jury could have determined that Mr. King's access to the vehicle's trunk through Ms. Washington gave him the ability to exercise dominion or control over the Hi-Point rifle stored therein. In particular, we note that Mr. King acknowledged owning the rifle. Possession and ownership are distinct concepts and the statute at issue punishes possession, not ownership. *See United States v. Turner*, 553 F.3d 1337, 1350 n.9 (10th Cir.) (noting that "mere knowledge and access to the ammunition—not ownership—was all that was required to convict [the defendant] of possession"), *cert. denied*, 129 S. Ct. 2446 (2009); *see also United States v. Rogers*, 41 F.3d 25, 30 (1st Cir. 1994) (noting that "ownership alone does not establish possession"). But a defendant's ownership of a firearm "may be highly relevant where the authority to exercise control is disputed." *Rogers*, 41 F.3d at 30. A reasonable jury could have easily inferred that if Mr. King owned the firearm and had access to it through Ms. Washington that he had the ability (i.e., the power) to exercise dominion or control over it.

In further resisting this conclusion, Mr. King also argues that, even assuming that his ability to control the firearm could be inferred from his relationship with Ms. Washington, the government failed to offer sufficient evidence that he *knowingly* held that ability, thereby precluding a finding of constructive possession.[7] *See Ledford*, 443 F.3d at 714 ("To sustain a conviction for constructive possession, the government must present 'evidence supporting at least a plausible inference that the defendant had *knowledge of* and access to the weapon.'" (emphasis added) (quoting *Hein Van Tieu*, 279 F.3d at 922)). Put differently, Mr. King suggests that a reasonable jury could not find, based on the evidence presented, that he constructively possessed the rifle because there was no evidence establishing that he even knew about the gun prior to his arrest. To

---

[7] In making this argument, Mr. King explicitly posits that the government failed to present evidence that established his "specific intent" to possess the rifle. Aplt. Opening Br. at 9 (citing *United States v. Newsom*, 452 F.3d 593, 606 (6th Cir. 2006)). We have not adopted the "specific intent" requirement in the constructive-possession context, and our research indicates that the Sixth Circuit stands alone in this regard. *See also United States v. Jenkins*, 388 F. App'x 625, 627 (9th Cir. 2010) (unpublished) ("We have never held that constructive possession requires specific intent . . . [and] Jenkins could only locate a single case anywhere in the country in which a circuit has done so." (citing *Newsom*)). We read Mr. King's argument as actually asserting that the government failed to prove that Mr. King had the requisite *knowledge* of the firearm necessary to find constructive possession. We find support for this interpretation in Mr. King's assertion that in order for a reasonable jury to find "this requisite specific intent . . . [,] the government must present evidence to show some connection or nexus between the defendant and the firearm, which can be established by showing the defendant had *knowledge* and access to the firearm." Aplt. Opening Br. at 9–10 (emphasis added) (quoting *Jameson*, 478 F.3d at 1209) (internal quotation marks and alterations omitted).

this end, Mr. King notes that his fingerprints were not found on the rifle, no keys to the vehicle were found on his person, and no testimony by a "percipient witness" was offered linking him to the car. Aplt. Opening Br. at 10.

In staking out this position, however, Mr. King ignores some of the strongest evidence presented against him, including his own admission to police that the rifle belonged to him and the photograph of the firearm found on his cell phone. Indeed, Mr. King claimed ownership of the rifle twice in front of law enforcement officers, and he did so the second time only after he was specifically warned not "to claim anything that is not [his]." R., Vol. II, at 59, 61. And, while we recognize that a defendant generally may not be convicted solely on the basis of his uncorroborated extrajudicial statements, *see Poe*, 556 F.3d at 1125–26 (citing *Smith v. United States*, 348 U.S. 147, 152 (1954)), that is not the situation here. The photograph of the rifle found on his cell phone provides strong circumstantial evidence that corroborates Mr. King's admission and cogent proof that Mr. King had knowledge of the rifle's existence prior to his arrest.[8] Moreover, the fact that the firearm was found stored next to quantities of

_____

[8] Mr. King makes much of the fact that Officer Taylor only testified that the rifle in the photograph "appears to be" the charged firearm. *See* Aplt. Opening Br. at 10 (quoting R., Vol. II, at 62). Officer Taylor's identification, however, was not conjectural, nor was it without an objective basis; specifically, it was grounded upon a unique feature of the rifle—its extended magazine. Given this, although Officer Taylor did not use the definitive "is," we conclude that a reasonable jury could find that the gun in the photograph was the one found in Ms. Washington's trunk.

marijuana that were consistent with drug trafficking—a crime that Mr. King does not currently deny committing—further suggests that Mr. King was speaking honestly when he stated that the rifle was his. Thus, when considering both Mr. King's admission and the corroborating evidence, we have no difficulty concluding that sufficient evidence existed to allow a reasonable jury to find that Mr. King constructively possessed the Hi-Point rifle. *See id.* at 1126 ("Far from requiring the government to corroborate each detail of [a defendant's] statement, . . . the 'corroboration rule' requires only that the government present evidence establishing the trustworthiness of the extrajudicial confession."); *cf. United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999) (noting that, when reviewing the sufficiency of the evidence, "[t]he evidence necessary to support a verdict 'need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt'" (quoting *United States v. Parrish*, 925 F.2d 1293, 1297 (10th Cir. 1991))).

**B.      Possession "In Furtherance" of a Drug-Trafficking Crime**

A conviction under § 924(c)(1)(A) requires more than just possession of a firearm; it also requires that such possession be "in furtherance" of (as relevant here) a drug-trafficking crime. 18 U.S.C. § 924(c)(1)(A); *accord United States v. Villa*, 589 F.3d 1334, 1341 (10th Cir. 2009), *cert. denied*, 131 S. Ct. 636 (2010). Mr. King challenges the sufficiency of the government's evidence as to this "in

furtherance" element, arguing that no evidence was presented linking the rifle to a drug-trafficking offense.

In the context of drug-trafficking crimes, firearms are frequently "tools of the trade," *United States v. Hall*, 473 F.3d 1295, 1304 (10th Cir. 2007), and we have recognized that "it is highly unlikely the presence of [a firearm] in a car containing a large amount of [narcotics] [is] merely coincidental," *United States v. McKissick*, 204 F.3d 1282, 1293 (10th Cir. 2000). Nevertheless, we have cautioned that the "mere presence of a firearm in an area where a criminal act occurs is not a sufficient basis for imposing [§ 924(c)(1)(A)'s] mandatory sentence." *United States v. Iiland*, 254 F.3d 1264, 1271 (10th Cir. 2001) (emphasis omitted) (quoting H.R. Rep. No. 105-344, at 12 (1997)). Instead, to meet the "in furtherance" element of § 924(c)(1)(A), we require "that the weapon further[], promote[] or advance[] a drug trafficking crime." *United States v. Luke-Sanchez*, 483 F.3d 703, 706 (10th Cir. 2007) (quoting *United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006)) (internal quotation marks omitted); *cf. Avery*, 295 F.3d at 1175 (noting that the presence of the firearm cannot be the result of accident or coincidence). In other words, to support a conviction under § 924(c)(1)(A), the government must "establish some nexus between the firearms and the underlying drug trafficking crime." *Luke-Sanchez*, 483 F.3d at 706.

- 19 -

"The intent to possess the weapon to further the drug trafficking crime is generally proven through circumstantial evidence . . . ." *United States v. Rogers*, 556 F.3d 1130, 1140 (10th Cir.), *cert. denied*, 129 S. Ct. 2783 (2009). We have identified a nonexclusive list of factors that are relevant when assessing whether the government has established the requisite nexus between the firearm and the drug-trafficking offense, including: "the type of drug activity being conducted, the accessibility of the firearm, the type of firearm, the legal status of the firearm, whether the firearm is loaded, the proximity of the firearm to drugs or drug profits, and the time and circumstances under which the firearm is found." *United States v. Trotter*, 483 F.3d 694, 701 (10th Cir. 2007) (quoting *United States v. Basham*, 268 F.3d 1199, 1208 (10th Cir. 2001)) (internal quotation marks omitted), *judgment vacated on other grounds by* 552 U.S. 1090 (2008), and 552 U.S. 1091 (2008); *see also Basham*, 268 F.3d at 1208 (addressing these factors for the first time in our circuit, in connection with a jury instruction challenge, and concluding that they "would be relevant and helpful to a jury in determining the intent with which the weapon was possessed").

Applying these *Trotter* factors to this case, we have little trouble concluding that sufficient evidence existed to support the jury's finding that Mr. King possessed a firearm in furtherance of a drug-trafficking crime. Mr. King has not appealed his conviction for possessing marijuana with the intent to distribute,

and, by his counsel's own admission, ample evidence existed that "Mr. King dealt drugs." R., Vol. II, at 15. The firearm was located in the trunk *right next to* the marijuana, meaning that it was immediately reachable when the drugs were being accessed. The firearm is a rifle, and the jury heard testimony from Officer Leatherman that, due to its size, such a weapon ordinarily would be kept by a drug-trafficker in someplace like a vehicle trunk "for some type of protection, intimidation type purpose." *Id.* at 94. And the gun was loaded, which naturally would make it better suited to serve as "protection for the marijuana." *Id.* at 98. Thus, viewed in the aggregate, the *Trotter* factors support the conclusion that the rifle was possessed in furtherance of Mr. King's drug trafficking. *See United States v. Lott*, 310 F.3d 1231, 1248 (10th Cir. 2002) ("We conclude that the placement of a loaded, semi-automatic weapon on the driver's seat of the car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence in furtherance of attempting to manufacture methamphetamine."); *see also Trotter*, 483 F.3d at 702 ("When guns and drugs are found together and a defendant has been convicted of possession with intent to distribute, the gun, whether kept for protection from robbery of drug-sale proceeds, or to enforce payment for drugs, may reasonably be considered to be possessed in furtherance of an ongoing drug-trafficking crime." (quoting *United States v. Garner*, 338 F.3d 78, 81 (1st Cir. 2003)) (internal

quotation marks omitted)); *United States v. Brooks*, 438 F.3d 1231, 1238 (10th Cir. 2006) (upholding a § 924(c)(1)(A) conviction where a "loaded revolver was found within ten feet of the recovered evidence of an active methamphetamine laboratory"); *United States v. Robinson*, 435 F.3d 1244, 1251 (10th Cir. 2006) (affirming a § 924(c)(1)(A) conviction where "the firearm was a fully loaded and chambered high-powered rifle easily within reach" and "in close proximity to drug paraphernalia").

Mr. King raises three arguments in opposition to this conclusion, none of which gives us pause. First, he reiterates his claim that he did not "possess" the gun, and argues, therefore, that it could not have been used "in furtherance" of his drug trafficking. Aplt. Opening Br. at 11–12. For the reasons discussed *supra* in Part II(A), this argument is without merit.

Second, Mr. King contends that Officer Taylor's admission that he did not see him with the gun, much less see him use it in his drug trafficking, must ineluctably lead to the conclusion that the government offered insufficient evidence that the rifle was used "to advance or further anything." Aplt. Opening Br. at 12. Mr. King, however, mistakes what is required of the government in this situation: the § 924(c)(1)(A) offense at issue here does not require evidence that the gun was actively used or employed, only evidence that it was "possessed" in furtherance of a drug-trafficking crime. *See Basham*, 268 F.3d at 1208

(recognizing that passive possession is all that is required for the possession-in-furtherance offense under § 924(c)(1); "a firearm that is kept available for use if needed during a drug transaction is 'possessed in furtherance of' drug trafficking, because such possession does not necessarily require 'use' as long as such possession 'in furtherance of' is the intent of the drug trafficker"); *cf. Watson v. United States*, 552 U.S. 74, 76–77 (2007) (noting, by way of contrast with respect to § 924(c)(1)(A)'s prohibition on the "use" of a firearm "during and in relation to" a drug-trafficking offense, that "mere possession does not amount to 'use': '§ 924(c)(1) requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense'" (quoting *Bailey*, 516 U.S. at 143)). Because the loaded rifle in this case was located immediately adjacent to the drugs, a reasonable jury could infer that it furthered Mr. King's drug trade by protecting Mr. King and his merchandise. *See Lott*, 310 F.3d at 1248; *see also Avery*, 295 F.3d at 1180–81 (collecting cases).

Finally, relying upon the Sixth Circuit's decision in *United States v. Mackey*, 265 F.3d 457 (6th Cir. 2001), Mr. King argues that "appellate courts have concluded that 'for the possession to be in furtherance of a drug crime, the firearm must be strategically located so that it is quickly and easily available for use.'" Aplt. Opening Br. at 12 (quoting *Mackey*, 265 F.3d at 462). Here, reasons Mr. King, "the rifle was not 'strategically located' such that it was 'quickly and

easily available for use' . . . [because] [i]t was locked in the trunk of a car," and Mr. King did not have a key to the trunk. *Id.* Furthermore, Mr. King suggests that he could not have intended the rifle to further any of his drug-trafficking because it could not intimidate anyone while it was concealed in the trunk.

Mr. King's arguments, however, are unavailing. There is no requirement that the firearm be accessible for use at all times. The focus is on whether the firearm was "kept available for use should it be needed *during a drug transaction*." *Villa*, 589 F.3d at 1341 (emphasis added) (quoting *Poe*, 556 F.3d at 1127) (internal quotation marks omitted); *accord United States v. Garza*, 566 F.3d 1194, 1202 (10th Cir. 2009); *Avery*, 295 F.3d at 1180. On these facts, the firearm clearly was available for use during any drug trafficking. The marijuana that Mr. King was convicted of possessing with the intent to distribute was stored in the trunk of a vehicle. In order to distribute that marijuana, Mr. King needed to remove it from the trunk. And, if he did so, Mr. King would have had immediate access to the rifle, which was located right next to the marijuana. Thus, the rifle was available for use at the relevant point in time—during Mr. King's drug trafficking. The fact that it was under lock and key and concealed at other times is of no moment.

Moreover, Mr. King's reliance on the Sixth Circuit's decision in *Mackey* is misplaced. The *Mackey* court stated: "In order for the possession to be in

furtherance of a drug crime, the firearm *must be* strategically located so that it is quickly and easily available for use." *Mackey*, 265 F.3d at 462 (emphasis added). Although *Mackey* recognized that "[o]ther factors . . . may be relevant to a determination of whether the weapon was possessed in furtherance of the crime," *id.*, it effectively established the accessibility factor *supra* as a threshold requirement. *See United States v. Wahl*, 290 F.3d 370, 376 (D.C. Cir. 2002) (noting that "[t]he [*Mackey*] court held it *essential* that the firearm be 'strategically located so that it is quickly and easily available for use'" (emphasis added) (quoting *Mackey*, 265 F.3d at 462)); *see also United States v. Charles*, 469 F.3d 402, 407 (5th Cir. 2006) (noting that *Mackey* "*requires* that for a firearm to be possessed in furtherance of a drug crime, it 'must be strategically located so that it is quickly and easily available for use'" (emphasis added) (quoting *Mackey*, 265 F.3d at 462)). Although we have referred to *Mackey*'s accessibility requirements, *see, e.g.*, *Lott*, 310 F.3d at 1247, we have not adopted them. Instead, we have opted for a more flexible approach in which "the accessibility of the firearm" is just one factor—albeit a significant one—in the analysis. *Trotter*, 483 F.3d at 701; *see Avery*, 295 F.3d at 1180–81 (collecting cases); *see also Villa*, 589 F.3d at 1342 (noting that "Ms. Villa kept the gun where she had immediate access to it").

Furthermore, even if we were bound by the requirements articulated in *Mackey*, we would conclude that they are satisfied on these facts. The rifle was

strategically located right next to the marijuana such that it was quickly and easily available for use by Mr. King when he was engaged in drug trafficking. That Mr. King would need to obtain the key from Ms. Washington to open the trunk would not aversely impact the speed with which he could access the weapon once he was inside the trunk and engaged in distributing the marijuana. Therefore, in light of the preceding analysis, we conclude that there was ample evidence from which a reasonable jury could find that the "in furtherance" requirement of § 924(c)(1)(A) was satisfied.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Mr. King's conviction.